UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GETTY IMAGES (US) Inc.,

                        :

              Plaintiff,

                        :

      -against-                      **MEMORANDUM AND ORDER**

                        :             09 Civ. 1895 (KNF)

ADVERNET, INC., f/k/a VR MARKETING, INC., :

                        :

             Defendant.
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## PROCEDURAL BACKGROUND

Getty Images (US) Inc., commenced this copyright infringement action, pursuant to 17 U.S.C. § 501, seeking monetary damages and injunctive relief against Advernet, Inc., formerly known as VR Marketing, Inc., due to the defendant's alleged unauthorized use of the plaintiff's photographic images.  The defendant made a motion to dismiss the complaint, pursuant to Rule 12 of the Federal Rules of Civil Procedure, claiming the: (a) plaintiff lacked standing to bring this action, because it did not allege that the licenses it obtained from the various photographers include an exclusive right to bring this action; and (b) complaint failed to state a cause of action, because it did not allege that the plaintiff has an exclusive right to enforce the rights in the images.  On July 6, 2009, the defendant withdrew its motion to dismiss and filed an answer.  The parties consented to proceed before the Court for all purposes, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  On May 19, 2010, the Court granted defense counsel's motion to withdraw from representing the defendant, based on the defendant's failure to pay legal fees.  By

1

that order, the Court also: (i) directed the defendant to engage new counsel, on or before June 1, 2010, because, as a corporate entity, it could not proceed pro se; (ii) directed the defendant to have its new counsel file, with the Clerk of Court, a notice of appearance on behalf of the defendant; (iii) informed the parties that a telephonic status conference would be held with them on June 7, 2010, and that counsel to the plaintiff should initiate the telephonic conference; and (iv) directed the relieved defendant's counsel "to serve a copy of this order on the defendant expeditiously and to file proof of service with the Clerk of Court," which he did.  The defendant failed to participate in the telephonic status conference on June 7, 2010.  No attorney filed a notice of appearance on behalf of the defendant.

On June 23, 2010, the plaintiff filed a motion for judgment, by default, pursuant to Rule 55 of the Federal Rules of Civil Procedure.  On November 2, 2010, the Court denied the plaintiff's motion, without prejudice, because, inter alia, no default had been entered by the Clerk of Court and, by a separate order, directed: (a) the Clerk of Court to enter the defendant's default; (b) the plaintiff to file proof of service on the defendant of a copy of the Clerk's Certificate noting the default, the entry of default and the Court's November 2, 2010 order; (c) the defendant to file a motion to set aside the default, pursuant to Fed. R. Civ. P. 55(c); and (d) absent a Fed. R. Civ. P. 55(c) motion, the plaintiff to file its motion for judgment, by default. No motion to set aside the default was filed.

On December 9, 2010, the plaintiff filed a motion for judgment, by default, pursuant to Fed. R. Civ. P. 55(b)(2).  The plaintiff seeks: (a) a default judgment against the defendant; (b) damages of $24,275.00, with interest; (c) an order "permanently enjoining Advernet from infringing Plaintiff's copyrighted images"; (d) "prejudgment interest on the amount of the award"; and (e) "such other and further relief as this Court deems just and proper."  On

December 16, 2010, the Court ordered that an inquest hearing be conducted, pursuant to Fed. R.

Civ. P. 55(b)(2), in connection with the plaintiff's motion, in order to establish: (a) the truth of

the allegations in the complaint; and (b) the amount of damages, and to investigate any other

pertinent matter.  The Court required: (i) evidence of the plaintiff's "exclusive license" to each

of the thirty-five images at issue, demonstrating the plaintiff's alleged rights to bring this action;

(ii) evidence of the period during which the infringement is alleged to have occurred respecting

each of the thirty-five images; (iii) evidence of the "information provided to [the plaintiff] by

defendant in response to [the plaintiff's] demand letters regarding the infringing use"; and

(iv) any other evidence in connection with the defendant's liability and damages.  The court also

directed the plaintiff to serve the defendant with a copy of the December 16, 2010 order, with

which the plaintiff complied.  Only the plaintiff appeared at the inquest hearing, held on

February 1, 2011, and presented evidence in support of its motion.  The motion is not opposed.

## BACKGROUND

### *Pleadings*

The plaintiff alleges, through the complaint, that it is "one of the world's leading content

providers, supplying high quality, relevant imagery and related services to advertising agencies,

graphic design firms, and film and broadcasting companies, to editorial customers involved in

newspaper, magazine, book, CD-ROM and online publishing, and to corporate marketing

departments and other business customers."  The plaintiff contends:

> Most of the images in [its] creative collections are obtained from independent
> photographers and filmmakers on an exclusive basis.  Professional photographers
> and filmmakers prefer to retain ownership of their work.  As a result, copyright to
> an image remains with the contributing photographer or filmmaker in most cases
> . . . . Getty Images was the first company to license imagery via the Internet
> and today delivers virtually all of its visual content digitally. . . . Visitors to

3

Getty Images's web site can search through and view hundreds of thousands
of images and obtain licenses for those images online.

According to the plaintiff, the defendant "owns and operates a web site" and "holds itself to be a
one stop shop to handle all of your web site needs . . . [f]rom website production to hosting to 3D
animation." Among other things, the defendant lists "Photography" and "Aerial Photography"
as categories of products and services it offers. The plaintiff alleges that, on June 2, 2006, it
notified the defendant of an alleged instance of unauthorized use, on its Web site, of "Image No.
wa0173-001." On July 5, 2006, the parties entered into a settlement and release agreement with
respect to the use of that image and the plaintiff reserved the right to seek redress for any
unauthorized use of photographs or images not disclosed by the defendant previously and for any
infringement occurring after June 13, 2006, including the infringement of the image number
"wa0173-001."

In September 2006, the plaintiff claims it discovered that the defendant "had obtained
copies of eight images exclusively licensed to Getty Images (and not covered by the settlement
and release agreement) and had incorporated those images into a web site designed, published
and managed by [the defendant] for Coquina Hotel, Ltd., at
http://www.holidayinmyrtlebeach.com. This use was continuous until at least September 25,
2006." According to the plaintiff, the defendant "began using at least four of these images in
August 2004 and had been using all of the eight images at least since May 18, 2006. In
December 2006, the plaintiff discovered copies of an (sic) additional two images exclusively
licensed to Getty Images (and not covered by the settlement and release agreement) incorporated
into the web site of Coquina Hotel, Ltd. at

http://www.holidayinmyrtlebeach.com/hotel_vacation_packages.html and

4

http://www.holidayinmyrtlebeach.com/hotel_meeting_rooms.htm." The plaintiff maintains that the defendant's "use of the ten images was unauthorized and violated the rights of Getty Images and of the authors of those images."

The plaintiff alleges further that, "[i]n September 2007, [it] discovered an additional thirty-three images exclusively licensed to Getty Images (and not covered by the settlement and release agreement) of which [the defendant] had obtained copies and incorporated into seven web sites, designed, published, and managed by [it]." According to the plaintiff, "[t]hirty-five of the images [the defendant] copied and incorporated into the web sites it designed, publishes, and manages have been registered with the United States Copyright Office." The thirty-five images alleged to have been infringed are as follows:

|  | Name | Image Number | Collection | Date of Registration | Registration Number |
|---|---|---|---|---|---|
| 1 | Back of woman in pool | CA33374 | Taxi | 12/21/2007 | VA-1-624-579 |
| 2 | "For Sale" sign outside house, close-up | BA60210 | Taxi | 12/27/2007 | VA-1-625-002 |
| 3 | Woman lying on raft in swimming pool, overhead view | AB22261 | Taxi | 1/3/2008 | VA-1-625-008 |
| 4 | Calendar pages, close-up (grainy) | BA17693 | Taxi | 1/2/2008 | VA-1-625-100 |
| 5 | Business woman catching falling money | 200167546-004 | Photographer's Choice | 1/3/2008 | VA-1-625-102 |
| 6 | Woman having a facial | CA08409 | Taxi | 1/3/2008 | VA-1-625-110 |
| 7 | Maid holding towels by indoor pool, portrait | 200218729-001 | Taxi | 1/3/2008 | VA-1-625-115 |
| 8 | Street signs superimposed on dollar signs, low angled (B&W) | 200009442-001 | Photographer's Choice | 1/3/2008 | VA-1-625-118 |

| 9 | Crowd Cheering at baseball game | 10197811 | The Image Bank | 1/3/2008 | VA-1-625-122 |
| 10 | Jetty extending into sea, Cancun, Yucatan, Mexico | 10197228 | Stone | 1/3/2008 | VA-1-625-123 |
| 11 | Young man with eye open wide, close-up | 200009356-001 | Photographer's Choice | 1/3/2008 | VA-1-625-124 |
| 12 | Couple making a toast in wine [close-up of hands and glasses] | BA62505 | Taxi | 1/3/2008 | VA-1-625-126 |
| 13 | Young woman floating in swimming pool, elevated view | 200134384-001 | Taxi | 1/3/2008 | VA-1-625-127 |
| 14 | Crowd of people walking on city street. Fifth Avenue, New York City, New York, USA | AB16310 | Taxi | 1/3/2008 | VA-1-625-134 |
| 15 | Soaring profits and costs with banknote in flight | 10026633 | The Image Bank | 1/3/2008 | VA-1-625-138 |
| 16 | Woman on rocks by ocean | AB91664 | Taxi | 1/9/2008 | VA-1-625-140 |
| 17 | USA, Nevada, Route 50 and cloudy sky (B&W) | 10189032 | Stone | 1/4/2008 | VA-1-625-141 |
| 18 | Financial still life/stock listings, graphs & glass globe | AB15395 | Taxi | 1/3/2008 | VA-1-625-144 |
| 19 | Man getting back massaged, close-up, elevated view (blurred motion) | AB70475 | Taxi | 1/4/2008 | VA-1-625-158 |
| 20 | Spain, Barcelona, crowd in La Rambla | BA11057 | Taxi | 1/4/2008 | VA-1-625-160 |
| 21 | People placing bets on gaming table, close-up | CA28987 | Taxi | 1/9/2008 | VA-1-625-304 |

| 22 | Manhattan at night, elevated view | 10193683 | Riser | 1/2/2008 | VA-1-625-489 |
| 23 | Woman embracing man, close-up (B&W) | CA32378 | Taxi | 1/9/2008 | Va-1-625-490 |
| 24 | Young man lying on bed with heated black stones on back, elevated view | 889907-001 | Stone | 1/2/2008 | VA-1-625-491 |
| 25 | Boeing 747 and sunset | AB64768 | Taxi | 1/2/2008 | VA-1-625-522 |
| 26 | Finance, investments, global markets, money | 10131999 | Stone | 1/3/2008 | VA-1-625-839 |
| 27 | Boy (4-6) with rubber ring in water | AB32869 | Taxi | 1/3/2008 | VA-1-625-854 |
| 28 | Towels, soap, and brush on wooden table | 886165-001 | Stone | 1/3/2008 | VA-1-625-855 |
| 29 | Desk in office, close-up | 200270761-001 | Photodisc | 1/9/2008 | VA-1-626-053 |
| 30 | Grandfather and grandson (6-8) arm wrestling on grass | DA60478 | Taxi | 1/9/2008 | VA-1-626-056 |
| 31 | China, Hong Kong, Convention and Exhibition Centre at dusk | BA01292 | Taxi | 1/9/2008 | VA-1-626-059 |
| 32 | USA, Hawaii, Oahu, Waikiki Beach, Diamond Head in background | 786033-001 | Stone | 2/14/2008 | VA-1-627-564 |
| 33 | Woman wearing bathrobe and towel around head, portrait | AB35519 | Taxi | 2/14/2008 | VA-1-627-566 |
| 34 | View of Las Vegas at night Nevada | CA16423 | Taxi | 2/14/2008 | VA-1-627-567 |
| 35 | Woman writing and having cup of coffee-Corsica | AB25548 | Taxi | 2/14/2008 | VA-1-627-572 |

The plaintiff submitted, as Exhibit A to its complaint, copies of registration certificates for these thirty-five images. The plaintiff alleges that the defendant "also copied into web sites it designed, publishes, and manages ten other images exclusively licensed to [the plaintiff] without authorization or license." "Screen shots" of the defendant's "web sites showing web pages that incorporate unauthorized copies of images exclusively licensed to Getty Images" were attached to the complaint as Exhibit B.[1] The plaintiff alleges the defendant's unauthorized use "of images exclusively licensed to Getty Images . . . has caused Getty Images to suffer damages," and seeks damages and injunctive relief.

In its answer, the defendant denied the allegations that any use of the plaintiff's images was unauthorized. It asserted the following affirmative defenses: (a) "any unauthorized use was inadvertent and innocent and did not constitute willful infringement"; (b) "[s]ome of the plaintiff's claims are barred by the applicable statute of limitation"; (c) "any unauthorized use was de minimus [sic] and should not result in a damages award"; (d) "any unauthorized use occurred prior to any registration of the images so that plaintiff may only seek actual damages"; (e) "[t]he images may have been available through means other than plaintiff's website"; and (f) "[t]he plaintiff's claims for relief are barred under the doctrine of laches."

### Rule 55 (b)(2) Hearing

At the hearing, the plaintiff's employee, David Wojtczak ["Wojtczak"], a supervisor on the copyright compliance team, testified that he manages a team that works to protect the plaintiff's content and pursue unauthorized use of it. He testified that the plaintiff's Exhibit B

---

[1] Exhibit B contains screen shots of the following images, which are not the thirty-five images at issue in this action, "Catalog Image No.": (1) ab72081 (two single-page documents); (2) 10035539; (3) 590897-005; (4) ab66821; (5) 995132-006; (6) bd6949-001; and (7) ea60278.

consists of the unauthorized use reports generated by PicScout, a company hired by the plaintiff to assist with identifying the plaintiff's content appearing on the web.  His understanding is that PicScout's method "involves something along the lines of a digital fingerprint technology, facial recognition type of software, where [the plaintiff's] content is provided to PicScout.  They have a database of all of our images, they go out on the web to a number of websites, and from there they identify content that is on the web and match it against our database that we've provided them."  According to Wojtczak, PicScout sends its reports to the plaintiff regularly, in order to enable the plaintiff to identify "any content that is out there that may be in breach of license, may be unlicensed, or may require additional licensing, and from there we look to protect the rights of the photographers and seek fees for uses that have already occurred."  Where the plaintiff determines that PicScout reports relate to individuals or businesses that do not have a relationship with the plaintiff, Wojtczak and his team "gather all of the evidence that's provided and we prepare everything into a letter.  We send a letter to the company that's been identified, and within that letter we include copies of the proofs that are delivered to us by PicScout, and Exhibit B is exactly what those look like to the end user."  Wojtczak testified that the purpose of contacting the end users is to "notify them that we've identified our images that we represent exclusively on their website, to request that they provide any confirmation of valid licenses, while pointing out that we have thoroughly searched our records and to date have been unable to identify any licenses remotely related to those uses."  His team then attempts to recover fees for any usage identified as unlicensed.

Wojtczak described the details of a PicScout report by using page 3 of Exhibit B[2] as an

---

[2]  Exhibit B contains multiple sheets paginated with number "3."  Page 3 used by Wojtczak to explain the PicScout report is the eighteenth page in Exhibit B and contains

example.  He explained that, on that page, the heading: (a) "Name" indicates "the end user company where the image was reported"; (b) "Home Page" indicates that company's home page on its Web site; (c) "Screen Capture" shows "a copy of the actual page in question where the image appeared," relative in size to the page on which it appeared; and (d) "Catalog Image No." shows "a copy of [the plaintiff's] digital original of that image."  Wojtczak also used Exhibit 2, introduced in evidence and labeled "Transaction Details," to demonstrate "the way [the plaintiff] receive[s] the information related to the use in question."  He explained that "[t]his report has information related to the date of upload and also information related to image size, which is one of the parameters in the license model."  Exhibit 2 shows September 6, 2007, as "the date of the uploading," which is "the date that the report is delivered to Getty Images by PicScout."  Wojtczak explained that Exhibit B is the PicScout report as it is sent by the plaintiff to the end user, after his team "strip[s] out some of the information," while Exhibit 2 is an example of a PicScout report received by the plaintiff.

The plaintiff introduced into evidence Exhibit 3, "a summary file that [Wojtczak put] together for the photographers related to this case and the 35 specific images. . . .  It's a summary of their agreement dates and also terms of the contracts and exclusive nature of representations."  According to Wojtczak, the summary contains information about the contract "for each photographer associated with the 35 images.  In some cases there are multiple entries for certain photographers because we have had prior contracts and then newer contracts that supersede."  However, he noted, one exception existed, "[t]here is a wholly owned image of the 35. . . . We don't have a contributor contract for that because we wholly - - we wholly own it and there's no

_____

information with respect to "Catalog Image No. 10026633," "Name: Spa Nique."

royalty payment." The plaintiff's Exhibit 3 summary is a table, consisting of the following categories, explained by Wojtczak: (1) "Image Number, which will match up to the images identified in the complaint"; (2) "the image collection that the image belongs to, on the Getty Images website"; (3) "the name of the photographer that owns the copyright to the image"; (4) "the contract detail for the original contract company or brand that the photographer first signed the agreement"; (5) "[t]he corresponding agreement date" ; and (6) "the three columns to the right, I have reviewed each contract to ensure that, number one, the content is exclusive to Getty Images, the - - Getty Images has the right to control claims, specifically unauthorized use claims, and Getty has the obligation to pay a percentage of either net or gross fees, depending on the contract and circumstance for each of these contributors." The three columns to which Wojtczak referred are: (i) "Accepted Content is Exclusive?," to which the answer is "Yes" for all entries on the summary, except for "Image Number AB35519," for which the answer is "n/a," because it is "wholly owned"; (ii) "Getty Images Has Rights to Control Claims?," to which the answer is "Yes" for all entries on the summary, except for "Image Number AB35519," where the answer is "n/a," and "Image Number 200270761-001," for which the answer is "Implied, Superseded by Unified Agreement"; and (iii) Getty Images has obligation to pay percentage of net or gross fees?," to which the answer is "Yes," except for "Image Number AB35519," where the answer is "n/a." He explained:

> Accepted content is content per terms of the contributor contract that Getty Images agreed to represent on behalf of the photographer, and once we accept that content, the terms of that are that it is exclusively available to Getty Images and the photographer will not make it available through any other stock photo agency or any other source.

With respect to the plaintiff's rights to control claims, Wojtczak stated that the plaintiff represents the photographer "for pursuit of unauthorized use claims or other legal claims

associated with that content." He explained that, under the column "Getty Images Has a Right to Control Claims?," "Image 200270761001" states "Implied superseded by unified agreement" because "[t]here is language in that particular contract from 2005 that suggests and implies that we pursue on their behalf for unauthorized use . . . we do have a newer contract with this contributor. . . . The newer contract . . . does specifically state that Getty Images has the right to control a claim." Wojtczak stated, with respect to the column about the plaintiff's obligation to pay a percentage of net or gross fees, that any license transaction "has a specific royalty rate assigned to it, and in some of the contracts, there are different situations where gross fees may apply or net fees may apply."

The plaintiff also introduced in evidence Exhibit 4, consisting of redacted copies of "each of the contracts summarized in [Exhibit 3 summary], and royalty rates contained in this particular copy of that set and certain other terms that [the plaintiff] considers proprietary have been redacted out." Wojtzack used, as an example, image number AB70475, from the "Taxi" collection, by "Laubacher, Kevin/Bailey-Laubacher Inc.," to explain the corresponding redacted portions of the "GETTY IMAGES CONTRIBUTOR AGREEMENT," contained in Exhibit 4. He stated that he looked at the following sections of "the Getty Images Contributor Agreement" pertaining to this image number, "to confirm that the language was in there with respect to the accepted . . . content being exclusive to Getty Images:" (1) "Exclusivity"; and (2) "Section 1.4 Right to Control Claims" which reads "You authorize Getty Images and Distributors at their expense the exclusive right to make, control, settle and defend Claims related to Accepted Content." Wojtczak explained that the "FPG International, LLC and Visual Communications Group, Ltd." are "the previous contract," entitled "VCG Brand Agreement." He stated, "that is the reason why we have two entries on my worksheet. We have VCG, which was a company

that was acquired by Getty Images, and postacquisition, we have the more recent Getty Images contributor contract." He testified that "FPG and VCG are . . . related. I believe FPG was the US division of VCG, Visual Communications Group. However, I'm not entirely sure on the relationship." Wojtczak did not know when Visual Communications Group, Ltd. was acquired by the plaintiff, but believed it was "sometime around 1999," and that, in acquiring Visual Communications Group, Ltd., the plaintiff also acquired FGP International, LLC. The reason Wojtczak used both, the "Getty Images Contributor Agreement" and "The VCG Brand Agreement," was

> to pull any prior contributor contracts that would have been in place at the time that these infringements occurred and then also provide you with any additional contracts that may have updated that relationship, and the Getty Images contributor agreement is an attempt - - my understanding of it is, it is an attempt to streamline and bring all these different agreements all under the same standard agreement, and I brought that to show the representation of the contributor was continuous throughout this period.

Wojtczak testified that the Getty Images Contributor Agreement did "not have signatures. It is a digitally accepted agreement. The contributor signed via our online contributor contract portal." The following ensued:

> THE COURT: And where, if anywhere, does a representative form Getty execute, sign the document, digitally or otherwise?
> THE WITNESS: You know, I'm not entirely familiar with where in the process that happens. All I know is the contributor agrees to the terms at the time of submission, and from that moment the contract becomes viewable as that contributor having a revised agreement, essentially. Any contributor that has not entered into the newer Getty Images contributor agreement as of yet, when viewing their information, when I went in to look for their contract, I could tell who - - who had executed and who had not, but I am not familiar with the process in terms of the actual execution.
> THE COURT: So you don't know if Getty representative executed the contributor agreement that is part of Exhibit 4 that you were discussing with me.
> THE WITNESS. I know that that is our normal business. I'm not personally involved in execution of the contracts. But to answer your question, I do not physically view anyone executing these agreements.
> I am not familiar with the process in terms of the actual execution.

With respect to Exhibit 3's column labeled "Getty Images Has Obligation to Pay Percentage or Net Gross Fees," Wojtczak explained that he "personally went through each of the contracts that have been gathered for these specific contributors and went through the unredacted versions and verified that there was the corresponding royalty fee language.  And what drives that is there are different collections, there are different rates based on where content is accepted."

The plaintiff introduced Exhibit 5, "SCI Shopping Cart Detail- SEADCSI03," which Wojtczak explained "is a printout view of a shopping cart from the Getty Images website.  This is the back-end view of that."  He explained that the shopping cart on Getty Images Web site "is the web interface where our clients go to transact, to search for our content, to license our content, and to complete the actual license transaction."  After the buyer pays for its shopping cart, "[t]he majority of the time [the buyer is] led to a download page and [can] download a digital file," and the buyer is also "granted rights per the terms of the transaction."  Wojtczak testified that all thirty-five items in the Exhibit 5 shopping cart

> were put into the shopping cart at the time that the case was being handled. . . .
> Typically [the shopping cart] is created on some level, either manually or via
> automation, shortly after the report is received from PicScout and after we verify that
> the use is indeed unauthorized. . . . We are taking the evidence that's been provided
> to us, and through the course of the case investigation or even during the course of
> discussions with the end user, we are determining what and how the images were
> used, and from there we are using the shopping cart functionality that is used on the
> front end for our - - for our customer to calculate license fees for the uses that have
> been identified.

In determining the price by using the shopping cart details, Wojtczak testified, he considers:

> The use field; the size field, the start date; and end date; the - - in some cases
> territory, if there are a number of territories; duration; placement; and also
> exclusivity. . . . [I]f the customer wanted to calculate a license fee, they [sic] would
> go to the website, either search for the content or already know the content that they

14

wanted to calculate before, they would pull up the price calculator; from within the price calculator there are a series of dropdown options, and you essentially go and choose the corresponding uses and parameters that match your needs. . . . There are additional fees for copyright enforcement.  In this particular case the fees in this Exhibit are the exact rates that applied at the time the infringements were identified.

The plaintiff also introduced in evidence Exhibit 6, illustrated partially in Appendix 1 to this Memorandum and Order.  Exhibit 6 "is a summary of the uses and the durations in question for each of the 35 images in this complaint," and its purpose was to "provide information supporting the dates that were used in the previous calculations[, in Exhibit 5]."  Exhibit 6 is a table, reflecting, for each of the thirty-five images at issue, the following categories: (1) "Name"; (2) "Image Number"; (3) "Date of Registration"; (4) "Registration Number"; (5) "Image Size"; (6) "Image Placement"; (7) "Dates of Use for Calculation"; (8) "License Duration Required"; and (9) "Evidence of duration of use."  Wojtczak explained that "duration,"in "License Duration Required," "is the duration of use that would have been required based on the - - based on the evidence of duration of use."  For example, for image number CA33374, "License Duration Required" is indicated as "Up to 2 years," which "means potentially anything over up to one year would fall in the up to two years category."  The range of duration the plaintiff offers to its customers is "[u]p to one month; up to three months; up to six months; up to one year; up to two years; up to three years; and up to five years," according to Wojtczak.  He explained that for each entry on Exhibit 6, he "compared the information from the shopping cart and also the evidence that was provided by PicScout and also information from WebArchive."  He used that information "[t]o determine the correct duration that would have been required had a license been obtained prior to the start of the use."  The following ensued:

Q. Okay.  Now the PicScout information alone, does that evidence use for a particular period?
A. Generally that would be for a minimum of up to one month.

15

Q. The PicScout report itself shows that the image was being used at least on the day PicScout acquired it; right?

A. Exactly.  So if you're using an image for one day, the corresponding license duration is up to one month.

Q. Now, for any image for which you didn't have any duration of use information other than the PicScout report, what duration of use did you set for the licensing?

A. The up to one month.

Q. And is that the least expensive license that Getty offers?

A. It is, at the time of - -

Q. At that time.

A. Yes.

Q. Now you mentioned that you also use the Internet Archive to - - as evidence of duration?

A. Correct.

Q. What is the Internet Archive?

A. It is a nonprofit website that essentially captures websites for historical purposes, and the websites are essentially stored and displayed as they appeared at a previous point in time.

. . .

Q. With respect to the information obtained from the Internet Archive, did you yourself replicate the Internet Archive searches relating to those images in Plaintiff's Exhibit 6 for which you referred to that Internet Archive as the source of data on duration?

A. I did.

Q. And when did you do that?

A. Last week.

The plaintiff introduced in evidence Exhibit 7, "the screen captures from WebArchive from last week."  Wojtczak explained:

> In the URL section at the top, immediately after the web.archive.org/web portion is a date.  The date is in year format.  So in this first example, image number CA16423, this is from 2004, December 4th.  And then to the right of that is the actual website in question, which in this case is adreamtrip.com.

He testified that, on the page he was describing, the image belonging to the plaintiff "is the Las Vegas image at the bottom of the screen capture."  When asked how the information from the WebArchive correlates to the information in Exhibit 6 and his determination respecting license duration, Wojtczak explained: "The duration of use, since it falls in a period that equated the two years, would require an up to two year license for that."  He testified that he confirmed that the

16

durations contained in the shopping cart are accurate, "with a few exceptions . . . that did not have any recoding in WebArchive or may have been blocked by something," which is indicated on Exhibit 6, and which prompted him to use the calculation for "the lowest resolution size, even though the use was larger than that." When asked how he determined that duration was up to three years for image number BA60210 in the shopping cart, Wojtczak testified:

> Based on the evidence that was available at the time, the use was determined to fall in the up to three years category. From time to time information that is stored in WebArchives may not remain there, and I am not aware of when exactly the activity took place. However, we do see that from time to time after we present notification of infringement.

The plaintiff introduced into evidence Exhibits 8 and 9, its counsel's communication with defense counsel concerning the alleged infringement. On September 14, 2007, the plaintiff's counsel informed defense counsel that certain Web sites contained the plaintiff's images and sought evidence of legitimate purchases by the defendant for the use of those images. On September 24, 2007, defense counsel responded, informing that the defendant "has in good faith removed all alleged unauthorized images referenced in [counsel's September 14, 2007] email" and requested copyright registration numbers for the "allegedly unauthorized images." The plaintiff also introduced in evidence Exhibit 10, "a license history summary that [Wojtczak] put together for the 35 images in this complaint . . . from the period between 2001 through about a week, week and a half ago, and from there we identified that there were a little over 1300 total individual license records for 35 images combined." That summary provided examples of licensing fees for specific images, during the period indicated in it.

17

## DISCUSSION

### *Legal Standard*

"Strong public policy favors resolving disputes on the merits." American Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996). "[T]he entry of a judgment by default [is a] drastic remed[y], and should be applied only in extreme circumstances." Independent Prods. Corp. v. Loew's Inc., 283 F.2d 730, 733 (2d Cir. 1960). "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed.  R. Civ. P. 55(a). Where a clerk has entered a party's default, and the plaintiff's claim is not "for a sum certain or a sum that can be made certain by computation, . . . the [plaintiff] must apply to the court for a default judgment." Fed. R. Civ. P. 55(b).

"[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability." Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). "[A]n allegation made indefinite or erroneous by other allegations in the same complaint is not a well-pleaded allegation." Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 63 (2d Cir. 1971), rev'd on other grounds, Hughes v. Trans World Airlines, Inc., 409 U.S. 363, 93 S. Ct. 647 (1973)). "[A] district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action." Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed true.  The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA) v. Alcantara, 183 F.3d 151, 155 (2d Cir.

18

1999) (citations omitted).  "The dispositions of motions for entries of defaults and default judgments and relief from the same under Rule 55(c) are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties."  Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993).

"It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."  Rowland v. Ca. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-02, 113 S. Ct. 716, 721 (1993).  "[W]here a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55 [of the Federal Rules of Civil Procedure]."  SEC v. Research Automation Corp., 521 F.2d 585, 589 (2d Cir. 1975).

In determining whether judgment by default is warranted, a court may consider a number of factors, including: (a) whether the grounds for default are clearly established; (b) whether the default was willful; (c) the extent of any prejudice to the plaintiff; (d) whether material issues of fact or issues of substantial public importance are at issue; (e) whether the default is largely technical; (f) whether a meritorious defense is presented; (g) the amount of money at stake in the action; and (h) whether the default was caused by a good-faith mistake or by excusable or inexcusable neglect on the part of the defendant.  See Enron Oil Corp., 10 F.3d at 96; 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, supra § 2685.

***Liability***

<u>Whether the Grounds for Default Are Clearly Established</u>

"Copyright in a work protected under [the Copyright Act] vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  "In the case of a work made for hire, the employer or

19

other person for whom the work was prepared is considered the author for purposes of [the Copyright Act], and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  17 U.S.C. § 201(b).  Subject to certain limitations of the Copyright Act, not applicable here, a copyright owner has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work; (2) to prepare derivative works; (3) to distribute copies of the copyrighted work; (4) to perform the copyrighted work publicly; and (5) to display the copyrighted work publicly.  See 17 U.S.C. § 106.

      "The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law. . . . Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately."  17 U.S.C. § 201(d).  "An owner may also convey his interest in prosecuting accrued causes of action for infringement."  Davis v. Blige, 505 F.3d 90, 99 (2d Cir. 2007).  "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."  17 U.S.C. § 101.  "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly unauthorized agent."  17 U.S.C. § 204(a).  "Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office if the document filed for recordation bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original,

signed document."  17 U.S.C. § 205(a).

"Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright or right of the author, as the case may be."  17 U.S.C. § 501(a).  "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).  The Second Circuit has recognized that an owner of an exclusive right is entitled to institute an action for infringement of that right committed prior to a grant of copyright from the grantor, provided that the document granting the particular right states explicitly that it includes the causes of action with respect to that right, accrued prior to the grant.  See Abkco Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir. 1991) ("Thus, a copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them."); see also MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.03.  "Once the copyright owner grants an exclusive license of particular rights, . . . only the exclusive licensee, and not his grantor, may sue for later-occurring infringements of such rights."  Supra, § 12.02.  "[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with [the Copyright Act]. . . . A certificate of registration satisfies the requirement of this section . . . ."  17 U.S.C. § 411.

"Any court having jurisdiction of a civil action arising under [the Copyright Act] may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  "[A]n infringer of copyright is liable for either - - (1) the copyright owner's

actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c)."  17 U.S.C. § 504(a).

To establish copyright infringement, a plaintiff must prove: "(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns

v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991).  "The word copying is

shorthand for the infringing of any of the copyright owner's five exclusive rights described in

[17 U.S.C.] § 106."  Arista Records LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (internal

quotation marks and citation omitted).  "A certificate of registration from the United States

Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright."

Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003).

"Interpretation of an agreement purporting to grant a copyright license is a matter of state

contract law."  Random House, Inc. v. Rosetta Books LLC, 150 F. Supp. 2d 613, 617-18

(S.D.N.Y. 2001).  None of the redacted agreements submitted in the plaintiff's Exhibit 4

establishes the existence of a choice of law provision, which is either not present or redacted.

Absent a choice of law by the parties, the Restatement of Law (Second) Conflict of Laws § 188

provides that the law of the state with the most significant relationship to the transaction and the

parties applies.  Notwithstanding the absence of evidence of a choice of law by the contracting

parties, it is a general principle of contract law that courts "must consider the words [of a

contract] themselves for they are always the most important evidence of the parties' intention."

Network Publ'g Corp. v. Shapiro, 895 F.2d 97, 99 (2d Cir. 1990) (citation omitted).

*Ownership of a Valid Copyright*

The plaintiff alleges that the thirty-five images at issue are "exclusively licensed to Getty

Images."  In support of this allegation, the plaintiff submitted a copy of a Copyright Office

certificate of registration for each of the thirty-five images.  All but one certificate of registration, namely certificate registration number VA-1-627-566, for the work titled "Woman wearing bathrobe and towel around head, portrait.  Getty Images number AB35519," demonstrate that the authors of works protected are also the copyright claimants.  Certificate of registration number VA 1-627-566, for the image number AB35519, is dated February 14, 2008, and shows: (a) the author is "Telegraph Colour Library"; (a) the copyright claimant is "Getty Images (US), Inc."; (b) "Work made for hire: Yes"; (c) "Transfer Statement: By written agreement"; and (d) "Getty Images (US), Inc." has "Rights and Permissions" with respect to the image registered.   The plaintiff's Exhibit 3 indicates that the photographer of image number AB35519 is "Getty Images," which is inconsistent with the certificate of registration number VA 1-627-566 for this image, showing "Telegraph Colour Library" as the author.  The plaintiff's Exhibit 3, in the category "Contract Company/Brand" for the image number "AB35519," indicates "n/a (wholly owned)."  Wojtczak testified concerning the Exhibit 3's "wholly owned" image that "we don't have a contributor contract for that because we wholly - - we wholly own it and there's no royalty payment."  Certificate of registration number VA 1-626-053, dated January 9, 2008, shows "Getty Images (US), Inc." is the author and the copyright claimant for the work titled "Desk in office, close-up.  Getty Images number 200270761-001," and that the work was made for hire.  The plaintiff's Exhibit 3 indicates that the photographer of image number 200270761-001 is "McVay, Ryan," which is inconsistent with the certificate of registration number VA 1-626-053 for this image, showing "Getty Images (US), Inc." as the author.

The allegation that all thirty-five images are "exclusively licensed to Getty Images" is not well pleaded because it is contradicted by: (i) certificate of registration number VA 1-626-053

for the image number 200270761-001, which shows that the plaintiff is the author and the claimant of the copyrighted work; and (ii) Exhibit 3 and Wojtczak's testimony that the image number AB35519 is "wholly owned" by the plaintiff.  If the image number AB35519 is "exclusively licensed to" the plaintiff, as it is alleged in the complaint, then the plaintiff does not "wholly own" that image, as Wojtczak testified and as stated in the plaintiff's Exhibit 3. "Wholly owned" and "exclusively licensed" are not interchangeable terms.  A license is a "permission, [usually] revocable, to commit some act that would otherwise be unlawful." BLACK'S LAW DICTIONARY 1002 (9th ed. 2009).  Ownership is "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others."  Id. at 1215. Similarly, if the plaintiff is the author and copyright claimant for the image number 200270761-001, then that image is not exclusively licensed to the plaintiff, because copyright vests initially in the author.  See 17 U.S.C. § 201(a).  Since the author(s) and copyright claimant(s) for each image at issue, except for the image number: (a) 20270761-001, registered by the certificate of registration number VA 1-626-053; and (b) AB35519, registered by the certificate of registration number VA 1-627-566; is not the plaintiff, the plaintiff must show that the author and copyright claimant of each of the images not authored by the plaintiff granted the plaintiff an exclusive license in that image, including the right to bring a copyright  infringement action in connection with it.

   *Exclusive License*

   In support of its allegation that the thirty-five images are "exclusively licensed" to it, the plaintiff submitted: (a) Exhibit 3, "a summary file that [Wojtczak] put together for the photographers related to this case and the 35 specific images. . . . It's a summary of their agreement dates and also terms of the contracts and exclusive nature of representations"; and

(b) Exhibit 4, redacted copies of various agreements, summarized in the plaintiff's Exhibit 3.  In its post-hearing memorandum of law, the plaintiff contends: "The license agreements in evidence as Plaintiff's Exhibit 3, the summary of the relevant terms of those agreements in evidence as Plaintiff's Exhibit 4, and the testimony of Mr. Wojtczak, prove that Getty Images has the exclusive rights to license the Registered Works and to bring an action for copyright infringement based on each Registered Work."

Wojtczak explained that Exhibit 3's category "Collection" is "the image collection that the image belongs to, on the Getty Images website" and category "Contract Company/Brand" is "the contract detail for the original contract company or brand that the photographer first signed the agreement; the corresponding agreement date."  When asked by the Court "how one determines that a photographer gave rights to what is called a brand company or contract brand company and then how those rights from the photographer come to Getty Images," Wojtczak failed to respond; instead he explained where in Exhibit 4's Getty Images contributor agreements he looked for information used to complete Exhibit 3's categories: (i) "Accepted Content is Exclusive?" and (ii) "Getty Images Has Rights to Control Claim?"  When the Court asked Wojtczak what are "FPG International, LLC" and "Visual Communications Group Limited," contained in the Exhibit 4's agreement, in connection with photographer "Kevin Laubacher/Bailey-Laubacher Inc.," and what is their relationship, Wojtczak responded that "Visual Communications Group" was acquired by the plaintiff "sometime around 1999" and he believed "FPG was the US division of VCG" but was "not entirely sure on the relationship."  He testified that FPG International, LLC was also acquired by the plaintiff because he was "familiar with the FPG collection from [his] time in sales. . . . [T]hat collection became known as the taxi collection."  When asked by the Court about the connection of Exhibit 4's "Getty Images

25

Contributor Agreement" to the "VCG Brand Agreement," in connection with the photographer "Kevin Laubacher/Bailey-Laubacher Inc.," Wojtczak explained that he tried "to pull any prior contributor contracts that would have been in place at the time that these infringements occurred and then also provide you with any additional contracts that may have updated that relationship" and he "brought that to show the representation of the contributor was continuous throughout this period."

Wojtczak's testimony that various agreements listed in the plaintiff's Exhibit 3, under the "Contract Company/Brand" category, represent "any prior contributor contracts that would have been in place at the time that these infringements occurred," is not helpful for determining whether the  images at issue are exclusively licensed to the plaintiff because the complaint failed to allege the time of infringement and the evidence presented at the hearing failed to establish the infringement time period.  Notwithstanding the plaintiff's failure to allege and establish the time of infringement pertinent to the thirty-five images, apart from explaining the relationship between FPG International, LLC, Visual Communications Group Limited and the plaintiff, and that FPG International, LLC and Visual Communications Group Limited are the companies that contracted originally with the photographers listed in the plaintiff's Exhibit 3, Wojtczak failed to explain the connection of other companies listed under Exhibit 3's category "Contract Company/Brand," to the plaintiff or whether these companies were acquired by the plaintiff or otherwise transferred photographers' exclusive rights in their photographs to the plaintiff. Neither Exhibit 3 nor Exhibit 4 establishes the relationship between these companies and the plaintiff or whether and when these companies transferred photographers' exclusive rights to the plaintiff.  The entities Wojtczak never mentioned or explained that are listed in Exhibit 3's category "Contract Company/Brand" and whose agreements with the authors of the images at

issue are contained in Exhibit 4 include: (1) "Visual Communications Group (VCG)"; (2) "Pix SAS"; (3) "The Image Bank, Inc"; (4) "Tony Stone Images/America Inc."; and (5) "Getty Images (UK) Ltd."  The following is a review of the redacted agreements submitted in Exhibit 4 and an analysis of the plaintiff's claim of exclusive rights with respect to each image at issue.

Image Number AB91664

Certificate of registration number VA-1-625-140, dated January 9, 2008, shows that "Mark Adams" and "Steven D. Smith" are the authors and the copyright claimants for the image number AB91664.  The plaintiff's Exhibit 3 shows that the author of the image number "ab91664" is "Adamsmith (Adams Mark and Smith, Steven D.)" and the "Contract Company/Brand" is "FPG International LLC."  Exhibit 4 contains a redacted agreement, dated January 6, 1998, titled "FPG INTERNATIONAL LLC PHOTOGRAPHER AGREEMENT," among photographer "ADAMSMITH," FPG International LLC, and Visual Communications Group Limited.  The January 6, 1998 agreement states, in pertinent unredacted parts: (a) "FPG is affiliated with VCG" and (b) the photographer "appoints the Agency . . . as the Photographer's exclusive agent in the Territory for licensing the Photographer's Images."  "The Territory" is not defined in the January 6, 1998,  redacted, incomplete agreement.  The certificate of registration and the January 6, 1998 agreement are inconsistent, because the certificate of registration shows that two individuals are the authors and copyright claimants for the image number AB91664, which was not a work for hire, whereas the January 6, 1998 agreement is made by "ADAMSMITH," which appears to be a business entity.  Even assuming that, as the plaintiff's Exhibit 3 claims, at some point in time subsequent to the January 6, 1998 agreement, "Adamsmith" gave exclusive rights to the plaintiff, it is not clear from the record evidence how that would be relevant to the plaintiff's claim of exclusive rights over the image number

27

AB91664, registered with the Copyright Office by two individuals, Mark Adams and Steven D. Smith, not the business entity "Adamsmith."  Where the work is co-authored, one copyright owner "may not, however, convey the interests of his fellow co-owners without their express written consent."  Davis, 505 F.3d at 99.  Therefore, to have a valid copyright ownership of the image number AB91644, the plaintiff must demonstrate that: (a) the image number AB91644 is covered by the January 6, 1998 agreement; and (b) both authors, not "ADAMSMITH," conveyed exclusive rights to it, which the plaintiff failed to do.  Thus, the plaintiff failed to establish ownership of a valid copyright in the image number AB91664.

Image Number BA11057

Certificate of registration number VA-1-625-160, dated January 4, 2008, shows that "Jonathan Arnold" is the author and the copyright claimant for the image number BA11057. The plaintiff's Exhibit 3 shows that the author of the image number "ba11057" is "Arnold, Jon" and the "Contract Company/Brand" is ""Visual Communications Group (VCG)."  It also shows, for the same image number "ba11057," that the author is "Arnold, Jon/Jon Arnold Images LTD" and the "Contract Company/Brand" is 'Getty Images (US), Inc."  Exhibit 4 contains only one redacted agreement, dated July 9, 1997, titled "PHOTOGRAPHER AGREEMENT," between "Visual Communications Group of Visual House . . . (which, together with its associate companies from time to time, is hereinafter called 'VCG')," which, according to the agreement, is a division of "Visual Communications Limited," and "Jon Arnold," by which the photographer "appoints VCG as his/her non-exclusive agent and representative throughout the world for the licensing of his/her Images."  The plaintiff's claim, in Exhibit 3, that the photographer of the image number "ba11057" is "Arnold, Jon/Jon Arnold Images LTD" is inconsistent with the certificate of registration showing that the author is "Jonathan Arnold."  To

28

establish a valid copyright ownership of the image number BA11057, the plaintiff must show that "Jonathan Arnold," not "Jon Arnold" or "Jon Arnold Images LTD," conveyed his exclusive rights in the image number BA11057 to the plaintiff, which the plaintiff failed to do.  Even assuming that Jonathan Arnold and Jon Arnold are the same person, the plain language of the July 9, 1997 agreement, by which "Jon Arnold" granted "non-exclusive" rights to Visual Communications Group of Visual House, contradicts the plaintiff's affirmative answer to Exhibit 3's category "Accepted Content is Exclusive?" and undermines Wojtczak's testimony that "I have reviewed each contract to ensure that . . . content is exclusive to Getty Images."  A person holding a non-exclusive right lacks standing to sue for copyright infringement.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91 (2d Cir. 1998).  Therefore, having failed to show it has an exclusive license in the image number BA11057, the plaintiff has no standing to sue for its copyright infringement.

Image Number AB25548

Certificate of registration number VA-1-627-572, dated February 14, 2008, shows that "Blue Artichoke Productions" is the author and the copyright claimant for the image number AB25548.  The plaintiff's Exhibit 3 shows that the author of the image number "ab25548" is "Denis Blue Artichoke Productions" and the "Contract Company/Brand" is "Pix SAS."  Exhibit 4 contains a redacted agreement, titled "THE PIX BRAND AGREEMENT," dated " ~~30/08/01~~ 1 October, 2001," between "PIX SAS" and "Blue Artichoke Productions," by which Blue Artichoke Productions grants "PIX SAS" exclusive right and license "[t]o reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of" its "Accepted Images."  No definition of "Accepted Images" exists in the redacted copy of the October 1, 2001 agreement.  Attached to the October 1, 2001 agreement are

29

two redacted pages, numbered "1" and "11."  The first page, titled "GETTY IMAGES STANDARD TERMS AND CONDITIONS," states, in pertinent part: "The Brand Agreement incorporates these Standard Terms by reference and any reference to the Brand Agreement herein shall be deemed to include a reference to these Standard Terms, unless the context requires otherwise."  The two pages and the October 1, 2001 agreement to which they are attached, do not refer specifically to each other.  Notwithstanding the plaintiff's failure to explain what relationship the two undated pages,[3] attached to the October 1, 2001 agreement, have to the agreement, the plaintiff also failed to explain what relationship, if any,  "PIX SAS" has to it or how any rights conveyed to PIX SAS by the October 1, 2001 agreement transferred to the plaintiff, if at all.  Thus, the plaintiff did not establish ownership of a valid copyright in the image number AB25548.

Image Number BA17693

Certificate of registration number VA-1-625-100, dated January 2, 2008, shows that "Bozena Iwanicka" is the author and the copyright claimant for the image number BA17693.  The plaintiff's Exhibit 3 shows that the author of the image number "ba17693" is "Canizzaro, Bozenna" and the "Contract Company/Brand" is "Visual Communications Group LTD."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT" dated "~~15.04.2001 1/8/01~~ Aug. 1. 01," between "Visual Communications Group Ltd." and an artist, "Bozenna Cannizzaro," by which the artist conveys to Visual Communications Group Ltd. exclusive right to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt,

---

[3] Both the October 1, 2001 agreement and the two extraneous pages contain the legend "2001 © Getty Images, Inc."  However, unlike the October 1, 2001 agreement, the two pages attached to it are not dated.  "Artist's initials" appear on the bottom of each of the two pages.

crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Attached to

the agreement are two redacted, undated, initialed and extraneous pages, titled "GETTY

IMAGES STANDARD TERMS AND CONDITIONS," containing language similar to that of

the two extraneous pages attached to the October 1, 2011 agreement discussed above.  The

plaintiff failed to explain the connection between the author and copyright claimant "Bozena

Iwanicka" and "Bozenna Cannizzaro," the party to the August 1, 2001 agreement.  Since the

plaintiff failed to show that Bozena Iwanicka conveyed exclusive rights in the image number

AB25548 to it, it did not establish ownership of a valid copyright in that image.

<u>Image Number 10193683</u>

Certificate of registration number VA-1-625-489, dated January 2, 2008, shows that

"Angelo Cavalli" is the author and the copyright claimant for the image number 10193683. The

plaintiff's Exhibit 3 shows that the author of the image number 10193683 is "Cavalli, Angelo"

and the "Contract Company/Brand" is "The Image Bank, Inc."  Exhibit 4 contains a redacted

agreement, titled "THE IMAGE BANK BRAND AGREEMENT" dated August 1, 2001,

between "The Image Bank, Inc." and an artist, "Angelo Cavalli," by which the artist conveys to

The Image Bank, Inc. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast,

display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any

Accepted Image."  However, by failing to explain: (i) what The Image Bank, Inc. is; and (ii) The

Image Bank, Inc.'s connection to it, the plaintiff did not demonstrate a valid copyright in the

image number 10193683.

<u>Image Number 1002663</u>

Certificate of registration number VA-1-625-138, dated January 3, 2008, shows that

"Gary S. Chapman" is the author and the copyright claimant for the image number 10026633.

31

The plaintiff's Exhibit 3 shows that the authors of the image number 10026633 are "Chapman, Gary & Vivian" and the "Contract Company/Brand" are "The Image Bank, Inc." and "The Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE IMAGE BANK BRAND AGREEMENT" dated "~~Nov 1, 2001~~ Aug 1-2001," between "The Image Bank, Inc." and artists  "Gary S. and Vivian Chapman," conveying exclusive rights to The Image Bank, Inc. to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains an agreement titled "GETTY IMAGES CONTRIBUTOR AGREEMENT," between Getty Images (US), Inc. and "Contributor," "Gary & Vivian Chapman," dated May 1, 2008, granting to Getty Images (US), Inc. "exclusive right to market and sublicense Reproduction Rights in Accepted Content" and "the exclusive right to make, control, settle and defend Claims related to Accepted Content." "Accepted Content" is defined as "Content and any modifications or Derivative Works of that Content that are submitted by Contributor and accepted for distribution under the Agreement or any prior contributor agreement between Contributor and Getty Images."  The May 1, 2008 agreement defines "Claims" as "any lawsuit, demands, or other claims including, but not limited to claims relating to infringements of copyrights and other intellectual property rights, unauthorized use, misuse, theft, damage, destruction and loss."  It also states:

> The Agreement supersedes and cancels any previous agreements related to the distribution of Accepted Content other than agreements: (i) where Getty Images has provided Contributor funds to create content through an advance, assignment or other agreement that governs specifically identified content generated for Getty Images; (ii) between Contributor and Digital Vision and (iii) which govern Iconica Images.

> The plaintiff failed to explain: (i) what The Image Bank, Inc. is;  (ii) The Image Bank, Inc.'s connection to it; (iii) how the May 1, 2008 agreement between Getty Images (US), Inc.

and "Gary & Vivian Chapman" is related to the August 1, 2001 agreement between "The Image Bank, Inc." and "Gary S. and Vivian Chapman;" (iv) whether the August 1, 2001 agreement was cancelled and superseded by the May 1, 2008 agreement; and (v) how the May 1, 2008 agreement by "Gary & Vivian Chapman" and the August 1, 2001 agreement by "Gary S. and Vivian Chapman" are related to the January 3, 2008 certificate of registration, issued to the author and copyright claimant "Gary S. Chapman."  Absent evidence that "Gary S. Chapman," not "Gary S. and Vivian Chapman" or "Gary & Vivian Chapman," conveyed exclusive rights to the plaintiff in the image 10026633, the plaintiff has not satisfied its burden of showing that it owns a valid copyright in the image number 10026633.

   Image Number AB22261

   Certificate of registration number VA-1-625-008, dated January 3, 2008, shows that "Ronald James Chapple" is the author and the copyright claimant for the image number AB22261.  The plaintiff's Exhibit 3 shows that the authors of the image number AB22261 are "Chapple, Ron" and the "Contract Company/Brand" is "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE TAXI BRAND AGREEMENT, between "Getty Images (US) Inc." and an artist, "Ron Chapple," dated "~~Dec 01~~ May 1, 2002," by which the artist conveys to "Getty Images (US) Inc." exclusive rights to  "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  The plaintiff failed to establish that: (a) the author and copyright claimant "Ronald James Chapple" is the same person as "Ron Chapple," who signed the May 1, 2002 agreement.  Absent evidence that "Ronald James Chapple" conveyed to the plaintiff his exclusive rights in the image number AB22261, the plaintiff has not established it possesses a valid copyright in connection with that image.

33

Image Number 786033-001

Certificate of registration number VA-1-627-564, dated February 14, 2008, shows that "Paul Chesley" is the author and the copyright claimant for the image number 786033-001.  The plaintiff's Exhibit 3 shows that the author of the image number 786033-001 is "Chesley, Paul" and the "Contract Company/Brand" are "Tony Stone Images/America Inc." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE STONE BRAND AGREEMENT," dated August 1, 2001, between "Tony Stone Images/America" and an artist, "Paul Chesley," by which the artist conveys to Tony Stone Images/ America his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a redacted  "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated October 1, 2008, which contains terms identical to those of the Getty Images Contributor Agreement discussed above in connection with the image number 10026633.  Since the plaintiff failed to explain: (i) what Tony Stone Images/America, Inc. is;  (ii) its connection to Tony Stone Images/America, Inc.; (iii) how the October 1, 2008 agreement between Getty Images (US), Inc. and Paul Chesley is related to the August 1, 2001 agreement between Tony Stone Images/America, Inc. and Paul Chesley; and (iv) whether the August 1, 2001 agreement was cancelled and superseded by the October 1, 2008 contributor agreement, it did not meet its burden of showing that it has a valid copyright in the image number 786033-001.

Image Number 10197228

Certificate of registration number VA-1-625-123, dated January 3, 2008, shows that "Cosmo Condina" is the author and the copyright claimant for the image number 10197228.  The plaintiff's Exhibit 3 shows that the author of the image number 10197228 is "Condina, Cosmo"

and the "Contract Company/Brand" are "Tony Stone Images/America Inc." and "Getty Images (US), Inc."  Exhibit 4 contains redacted agreements titled: (a)"THE STONE BRAND AGREEMENT," dated November 1, 2001, between "Tony Stone Images/America" and an artist, "Cosmo Condina," by which the artist conveys to Tony Stone Images/America, Inc. his exclusive rights to  "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image"; (b) "THE IMAGE BANK BRAND AGREEMENT," dated November 1, 2001, between "The Image Bank, Inc." and "Cosmo Condina," by which the artist conveys to The Image Bank, Inc. his exclusive rights to  "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image"; and (c) "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated May 1, 2008, which contains terms identical to those of the Getty Images Contributor Agreement discussed above in connection with the image number 10026633.  Since the plaintiff failed to explain: (i) what Tony Stone Images/America, Inc. and The Image Bank, Inc. are;  (ii) its connection to the Tony Stone Images/America, Inc. and The Image Bank, Inc.; (iii) how the May 1, 2008 agreement between Getty Images (US), Inc. and Cosmo Condina is related to the November 1, 2001 agreement between Tony Stone Images/America, Inc. and Cosmo Condina and to the November 1, 2001 agreement between The Image Bank, Inc. and Cosmo Condina; and (iv) whether either or both November, 2001 agreements were cancelled and superseded by the May 1, 2008 contributor agreement, it did not meet its burden of showing that it has a valid copyright in the image number 10197228.

Image Number 10189032

Certificate of registration number VA-1-625-141, dated January 4, 2008, shows that

"Peter de Lory" is the author and the copyright claimant for the image number 10189032. The plaintiff's Exhibit 3 shows that the author of the image number 10189032 is "deLory, Peter" and the "Contract Company/Brand" is "The Image Bank, Inc."  Exhibit 4 contains a redacted agreement, titled "THE IMAGE BANK BRAND AGREEMENT," dated August 1, 2001, between "The Image Bank, Inc." and an artist, "Peter deLory," by which the artist conveys to The Image Bank, Inc. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Since the plaintiff failed to explain: (i) what The Image Bank, Inc. is ; and (ii) its connection to The Image Bank, Inc., it did not demonstrate that it has a valid copyright in the image number 10189032.

Image Number AB35519

Certificate of registration number VA-1-627-566, dated February 14, 2008, shows that "Telegraph Colour Library" is the author of the image number AB35519, which was a work for hire, and "Getty Images (US), Inc." is a copyright claimant and that "rights and Permissions" are also in "Getty Images (US), Inc."  The plaintiff's Exhibit 3 shows that the author of the image number AB35519 is "Getty Images" and the "Contract Company/Brand" category indicates "n/a(wholly owned)."  Wojtczak testified, with respect to the image number AB35519, that "we don't have a contributor contract for that because we wholly - - we wholly own it and there's no royalty payment."  The certificate of registration number VA-1-627-566 shows that the plaintiff is the copyright claimant.  Therefore, the plaintiff established that, on February 14, 2008, it had a valid copyright in the image number AB35519.  However, the plaintiff failed to provide: (i) evidence of the written agreement transferring the author's exclusive rights to it; and (ii) the date of that agreement.  In addition, the plaintiff failed to establish that the agreement transferred to it

36

the author's exclusive rights to bring an action for the claims that accrued prior to the date of the transfer.  In light of Wojtczak's contradicting testimony, that the image number AB35519 is "wholly owned" and that "each one of the . . . 35 images that [is] the subject of this case are also the subject of an exclusive license to Getty," it is not clear whether the written agreement by which the author transferred its rights to the plaintiff involved a licensing agreement, sale of all or some of the author's exclusive rights or some other type of transfer.  Given the contradicting testimony of the plaintiff's representative about the nature of the plaintiff's rights in the image number AB35519, and the lack of evidence corroborating that the image number AB35519 is "wholly owned" by, rather than "exclusively licensed" to the plaintiff, the Court cannot conclude that the plaintiff satisfied its burden in showing it has a valid copyright in the image number AB35519.

<u>Image Number 200218729-001</u>

Certificate of registration number VA-1-625-115, dated January 3, 2008, shows that "Zena Holloway" is the author and the copyright claimant for the image number 200218279-001. The plaintiff's Exhibit 3 shows that the author of the image number 200218729-001 is "Zena Holloway" and the "Contract Company/Brand" are "Getty Images (UK), Ltd." and "Getty Images (US), Inc.  Exhibit 4 contains redacted agreements titled: (a) "THE TAXI BRAND AGREEMENT," dated "~~31/01/03~~ 01 FEB 2003," between "Getty Images (UK) Ltd" and an artist, "Zena Holloway," by which the artist conveys to Getty Images (UK) Ltd her exclusive rights to  "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image"; (b) "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated October 1, 2009, which contains terms identical to those of the Getty Images Contributor Agreement discussed above in connection

with the image number 10026633; and (c) "GETTY IMAGES STANDARD TERMS AND CONDITIONS," a two-page, extraneous document similar to the two-page document in connection with the image number AB25548.  The plaintiff failed to explain: (i) the two extraneous pages, attached to the February 1, 2003 agreement, which does not refer to them; (ii) the relationship between Getty Images (UK) Ltd and itself; and (iii) whether the February 1, 2003 agreement by "Getty Images (UK) Ltd" was cancelled and superseded by the October 1, 2009 agreement with Getty Images (US), Inc.  Moreover, the October 1, 2009 agreement does not grant to Getty Images (US), Inc. an exclusive right to bring an action for copyright infringement for the claims that accrued before the date of the agreement.  Thus, the plaintiff failed to demonstrate it has a valid copyright in the image number 200218729-001.

Image Number 10131999

Certificate of registration number VA-1-625-839, dated January 3, 2008, shows that "Steven Gary Hunt" is the author and the copyright claimant for the image number 10131999. The plaintiff's Exhibit 3 shows that the author of the image number 10131999 is "Hunt, Steven" and the "Contract Company/Brand" is "The Image Bank, Inc."  Exhibit 4 contains a redacted agreement, titled "THE IMAGE BANK BRAND AGREEMENT" dated "6/1/01 08-01-01," between "The Image Bank, Inc." and an artist ,"Steven Hunt," by which the artist conveys to The Image Bank, Inc. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Even assuming that the copyright claimant "Steven Gary Hunt" is the same person as "Steven Hunt," who entered into the August 1, 2008 agreement, since the plaintiff failed to explain: (i) what The Image Bank, Inc. is ; and (ii) its connection to The Image Bank, Inc., it did not demonstrate that it has a valid copyright in the image number 10131999.

Image Number AB16310

Certificate of registration number VA-1-625-134, dated January 3, 2008, shows that

"Richard Laird" is the author and the copyright claimant for the image number AB16310. The

plaintiff's Exhibit 3 shows that the author of the image number "ab16310l" is "Richard Laird"

and the "Contract Company/Brand" is "FPG International LLC."  Exhibit 4 contains a redacted

agreement, titled "THE VCG BRAND AGREEMENT," dated "Mar 1- 2002," between FPG

International LLC and Visual Communications Group Limited (the 'Brand Company')" and

artist Richard Laird, by which the artist conveys to the Brand Company his exclusive rights to

"reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast,

enhance, or create derivative works of any Accepted Image."  Given that Wojtczak testified that

the plaintiff acquired FPG International LLC and Visual Communications Group Limited "some

time around 1999," as of March 1, 2002, the plaintiff had an exclusive license respecting

Richard Laird's accepted images.  As the plaintiff maintains that the image number AB16310

was such an accepted image, the plaintiff established a valid copyright ownership of that image

as of March 1, 2002.

Image Number AB70475

Certificate of registration number VA-1-625-158, dated January 4, 2008, shows that

"Kevin Laubacher" is the author and the copyright claimant for the image number AB70475.

The plaintiff's Exhibit 3 shows that the author of the image number "ab70475" is "Laubacher,

Kevin/Bailey-Laubacher Inc." and the "Contract Company/Brand" are "FPG International LLC"

and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG

BRAND AGREEMENT," dated "Nov 1, 2001" between "FPG International LLC and Visual

Communications Group Limited (collectively the 'Brand Company')" and "~~Kevin Laubacher~~

Bailey-Laubacher, Inc.," by which Bailey-Laubacher, Inc. conveys to the Brand Company its exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  The plaintiff failed to explain: (a) the modification of that part of the agreement, which states its parties; (b) why a person's name "Kevin Laubacher" was replaced, without any initials next to it, with a corporate name "Bailey-Laubacher, Inc."; and (c) the absence of initials next to the modification identifying the person who made the modification.  Exhibit 4 also contains a redacted "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated October 1, 2008, with "Bailey-Laubacher Inc.," containing language identical to that found in other Getty Images contributor agreements discussed above.  Even assuming that the November 1, 2001 agreement was legitimately made by "Bailey-Laubacher, Inc." rather than "Kevin Laubacher," the plaintiff's contributor's agreement with "Bailey-Laubacher, Inc." does not show that the copyright owner "Kevin Laubacher" conveyed his exclusive rights in the image number AB70475 to the plaintiff.

Image Number AB15395

Certificate of registration number VA-1-625-144, dated January 3, 2008, shows that "Jook P. Leung" is the author and the copyright claimant for the image number AB15395. The plaintiff's Exhibit 3 shows that the author of the image number "ab15395" is "Leung, Jook P (Leung, J. (Jook)" (sic) and the "Contract Company/Brand" is "FPG International LLC." Exhibit 4 contains a redacted agreement, titled "FPG INTERNATIONAL LLC PHOTOGRAPHER AGREEMENT," dated December 5, 1998, between "FPG International LLC," "Visual Communications Group Limited . . . collectively known as the 'Agency,'" and a photographer, "Jook Leung," by which the photographer "appoints the Agency . . . as the Photographer's agent in the Territory for licensing the Accepted Images. . . . The Photographer is

entitled to license Images, other than Accepted Images, directly to Clients or through any other

Stock Agency."  The definition of "Territory" is not in evidence because it is not included in the

agreement or is redacted.  "Accepted Images" is defined as "the Photographer's Images currently

on file with FPG, its Affiliates, and/or Sub-Agents, and includes the Similars and Duplicates of

the Accepted Images as defined herein."  The agreement also states: "The Agency shall

determine if, and when, any legal action shall be pursued with regard to the Accepted Images,

whether for copyright infringement, loss, damage or any other reason, and shall have complete

discretion regarding its choice of attorney."  The December 5, 1998  agreement, on its face, does

not provide explicitly any exclusive rights to "the Agency," including the exclusive right to

claim copyright infringement; rather, it appoints the Agency as an agent for the Accepted Images

only and conveys to the Agency only the right "to determine if, and when, any legal action shall

be pursued" and to "have complete discretion regarding its choice of attorney."  Accordingly, the

plaintiff failed to show it has an exclusive license to exploit the copyright in the image number

AB15395.

  Image Number CA32378

  Certificate of registration number VA-1-625-490, dated January 9, 2008, shows that

"William A. Losh" is the author and the copyright claimant for the image number CA32378. The

plaintiff's Exhibit 3 shows that the author of the image number "ca3378" is "Losh, Bill" and the

"Contract Company/Brand" is "Visual Communications Group Limited."  Exhibit 4 contains a

redacted agreement, titled "THE VCG BRAND AGREEMENT," dated November 1, 2001,

between "FPG International LLC[, . . . ] Visual Communications Group Limited (collectively the

'Brand Company'), and Bill Losh," by which Bill Losh grants exclusive right and license "[t]o

reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast,

enhance, or create derivative works of any Accepted Image."   Since the plaintiff did not show that the copyright claimant "William A. Losh" is the same person as "Bill Losh" who signed the November 1, 2001 agreement, it failed to establish it has an exclusive right to bring a copyright action in connection with the image number CA32378.

Image Number DA60478

Certificate of registration number VA-1-626-056, dated January 9, 2008, shows that "Frederic Lucano" is the author and the copyright claimant for the image number DA60478. The plaintiff's Exhibit 3 shows that the author of the image number DA60478 is "Lucano, Frederic" and the "Contract Company/Brand" is "Pix SAS-Contract is in French."  Exhibit 4 contains a redacted agreement, in the French language, titled "LE CONTRAT TYPE DE PIX," dated October 2001, between "PIX SAS (la 'Société de la Marque')" and an artist, "Frédéric Lucano," by which the artist conveys to "la Société du Groupe" exclusive rights to reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of his images.  The October 2001 agreement explains that the contracting party "PIX SAS" is an intermediary of "la Société du Groupe," to which the artist grants his exclusive rights.  Given that the plaintiff did not establish any relationship between "PIX SAS" and itself or "la Société du Groupe" and itself, it failed to show its exclusive license to exploit the copyright in the image number DA60478.

Image Number 20270761-001

Certificate of registration number VA-1-626-053, dated January 9, 2008, shows that "Getty Images (US), Inc." is the author and the copyright claimant for the image number 20270761-001.  The plaintiff's Exhibit 3 shows that: (a) the author of the image number 2027076-001 is "McVay, Ryan"; (b) the "Contract Company/Brand" is "Getty Images (US),

Inc."; (c) the category "Getty Images Has Right to Control Claim" states "Implied, Superseded by Unified Agreement"; and (d) the category "Getty Images has obligation to pay percentage of net or gross fees?" states "Yes."  Exhibit 4 contains a redacted agreement, titled "GETTY IMAGES ROYALTY FREE ARTIST AGREEMENT," dated February 1, 2005, between "Getty Images (US), Inc." and "Ryan McVay," stating:

> in consideration of the royalty payments set forth herein, Artist grants to Getty a worldwide, assignable, irrevocable license, with right to sublicense, to use, copy, put into digital form, publish, reproduce, adapt, distribute, market, sublicense, transmit, broadcast, display, exhibit, project, rent, communicate and/or make available to the public, modify, enhance and make derivatives of all Content."

The license granted is "exclusive with respect to the Content accepted by Getty Images and any Substantially Similar Content."  The February 1, 2005 agreement is ambiguous, because its title states that it is a "ROYALTY FREE ARTIST AGREEMENT," while the agreement's text explains it is "in consideration of the royalty payments set forth herein."  The February 1, 2005 agreement does not mention "work for hire," which is what the image number 200270761-001 appears to be, according to the certificate of registration number VA 1-626-053.  The plaintiff failed to explain whether the image number 20270761-001 was covered by the February 1, 2005 agreement.  Exhibit 4 also contains a "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated December 1, 2009, between Getty Images (US), Inc. and Ryan McVay, by which Ryan McVay grants exclusive rights to the plaintiff "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  However, the December 1, 2009 agreement does not provide explicitly for an exclusive right to pursue the claims of copyright infringement that accrued prior to the date of the agreement.

Notwithstanding the February 1, 2005 and the December 1, 2009 agreements, given that: (i) registration certificate number VA 1-626-053 for the image number 20270761-001 shows that

Getty Images (US), Inc. is the author and copyright claimant for the image number 200270761-001; (ii) the image number 20270761-001 was a work for hire; (iii) neither the February 1, 2005 nor the December 1, 2009 agreement contains express language that Getty Images (US), Inc. is not a copyright owner of the work for hire; and (iv) registration certificate number VA 1-626-053 for the image number 20270761-001 is <u>prima facie</u> evidence of the plaintiff's valid copyright ownership, <u>see</u> <u>Jorgensen</u>, 351 F.3d at 51, the plaintiff established it has a valid copyright in the image number 200270761-001.

Image Number 10197811

Certificate of registration number VA-1-625-122, dated January 3, 2008, shows that "Michael Melford" is the author and the copyright claimant for the image number 10197811. The plaintiff's Exhibit 3 shows that the author of the image number 10197811 is "Melford, Michael" and the "Contract Company/Brand" is "The Image Bank, Inc."  The plaintiff's Exhibit 3 shows that the author of the image number 10197811 is "Melford, Michael" and the "Contract Company/Brand" is "The Image Bank, Inc."  Exhibit 4 contains a redacted agreement, titled "THE IMAGE BANK BRAND AGREEMENT," dated August 1, 2001, between "The Image Bank, Inc." and an artist, "Michael Melford," by which the artist conveys to The Image Bank, Inc. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Since the plaintiff failed to explain: (i) what The Image Bank, Inc. is; and (ii) its connection to The Image Bank, Inc., it did not demonstrate that it has an exclusive copyright in the image number 10197811.

Image Number 200009442-001

Certificate of registration number VA-1-625-118, dated January 3, 2008, shows that

44

"Christian Michaels" is the author and the copyright claimant for the image number 200009442-001.  The plaintiff's Exhibit 3 shows that the author of the image number 200009442-001 is "Michaels, Christian" and the "Contract Company/Brand" is "The Image Bank, Inc."  The plaintiff's Exhibit 3 shows that the author of the image number 10197811 is "Melford, Michael" and the "Contract Company/Brand" is "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE PHOTOGRAPHER CHOICE BRAND AGREEMENT," dated October 1, 2002, between "Getty Images (US) Inc." and an artist, "Christian Michaels," by which the artist conveys to Getty Images (US) Inc. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  As the plaintiff maintains that the image number 200009442-001 is covered by the October 1, 2002 agreement, the plaintiff established that, as of October 1, 2002, it had a valid copyright in that image.

Image Number BA62505

Certificate of registration number VA-1-625-126, dated January 3, 2008, shows that "Jean-Paul Nacivet," with a pseudonym "J.P. Fruchet," is the author and the copyright claimant for the image number BA62505. The plaintiff's Exhibit 3 shows that the author of the image number "ba62505" is "Nacivet, Jean-Paul (Fruchet, J.P.)" and the "Contract Company/Brand" are "Visual Communications Group Ltd." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated "1ˢᵗ July 2001 01 AUG 2001," between "Visual Communications Group Ltd." and an artist, "Jean-Paul Nacivet," by which the artist conveys to Visual Communications Group Ltd. the exclusive right to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a "GETTY

IMAGES CONTRIBUTOR AGREEMENT," dated May 1, 2008, between Getty Images (US), Inc. and an artist, Jean Paul Nacivet, by which the artist grants to Getty Images (US), Inc. his rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  Given that the plaintiff testified it acquired Visual Communications Group Ltd some time around 1999 and that it maintains that the image number BA62505 is covered by the August 1, 2001 agreement, the plaintiff established that, as of August 1, 2001, it had a valid copyright in the image number BA62505.

Image Number BA01292

Certificate of registration number VA-1-626-059, dated January 9, 2008, shows that "David Noton" is the author and the copyright claimant for the image number BA01292. The plaintiff's Exhibit 3 shows that the author of the image number "ba01292" is "Noton, David" and the "Contract Company/Brand" are "Visual Communications Group Ltd." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated October 1, 2001, between "Visual Communications Group Ltd." and an artist, "David Noton," by which the artist grants an exclusive right and license "[t]o reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of" any Accepted Image."  Exhibit 4 also contains a "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated June 1, 2008, between Getty Images (US), Inc. and "David Noton Photography," by which an entity, "David Noton Photography" grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  The fact that the plaintiff, on June 1, 2008, possessed an exclusive license to accepted content of the entity "David Noton Photography," does not establish that the author and copyright claimant "David Noton" granted the plaintiff his

46

exclusive rights in the image number BA01292.

Image Number CA16423

Certificate of registration number VA-1-627-567, dated February 14, 2008, shows that "Nigel Francis," with a pseudonym "Fergus O'Brien," is the author and the copyright claimant for the image number CA16423. The plaintiff's Exhibit 3 shows that the author of the image number "ca16423" is "O'Brien, Fergus (Francis, Nigel)" and the "Contract Company/Brand" is "Visual Communications Group Limited." Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated January 1, 2001, between "FPG International LLC and Visual Communications Group Limited (collectively the 'Brand Company'), and Nigel Francis, by which the artist conveys to the Brand Company an exclusive right "[t]o reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image." Given that the plaintiff testified it acquired Visual Communications Group Ltd some time around 1999 and that it maintains that the image number CA16423 is covered by the January 1, 2001 agreement, the plaintiff established that, as of January 1, 2001, it had a valid copyright in the image number CA16423.

Image Number 200167546-004

Certificate of registration number VA-1-625-102, dated January 3, 2008, shows that "Shalom Ormsby" is the author and the copyright claimant for the image number 200167546-004. The plaintiff's Exhibit 3 shows that the author of the image number 200167546-004 is "Plush Studios (Ormsby, Shalom)" and the "Contract Company/Brand" is "Getty Images (US), Inc." Exhibit 4 contains a redacted agreement, titled THE STONE BRAND AGREEMENT," dated June 20, 2002, between "Getty Images, Inc." and an entity, "Plush Studios," by which "Plush Studios" conveys to "Getty Images, Inc." its exclusive rights to "reproduce, distribute,

publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image." The plaintiff failed to show that the copyright owner of the image 200167546-004, "Shalom Ormsby," granted it any exclusive rights in that image, and the June 20, 2002 agreement by "Plush Studio," signed by an artist "Trinette Reed (Plush Studios)," without more, does not demonstrate the plaintiff's exclusive license in the image number 200167546-004.

    <u>Image Number BA60210</u>

    Certificate of registration number VA-1-625-002, dated December 27, 2007, shows that "Alan James Powdrill" is the author and the copyright claimant for the image number BA60210. The plaintiff's Exhibit 3 shows that the author of the image number "ba60210" is "Powdrill, Alan" and the "Contract Company/Brand" are "Visual Communications Group Ltd." and "Getty Images (US), Inc." Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated October 1, 2001, between "Visual Communications Group Ltd." and an artist, "Alan Powdrill," by which the artist conveys to Visual Communications Group Ltd. the exclusive right "[t]o reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image." Exhibit 4 also contains a "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated June 1, 2009, between Getty Images (US), Inc. and "Alan Powdrill" by which he grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims. Since Visual Communications Group Limited was acquired by the plaintiff some time in 1999 and the plaintiff maintains that the image number BA60201 is an accepted image for the purpose of the October 1, 2001 agreement, the plaintiff established that, as of October 1, 2001, it had a valid copyright in that image.

Image Number CA08409

Certificate of registration number VA-1-625-110, dated January 3, 2008, shows that

"Kenneth Bruce Reid" is the author and the copyright claimant for the image number CA08409.

The plaintiff's Exhibit 3 shows that the author of the image number "ca08409" is "Reid, Ken"

and the "Contract Company/Brand" is "Getty Images (US), Inc."  Exhibit 4 contains a redacted

agreement, titled "GETTY IMAGES CONTRIBUTOR AGREEMENT" dated June 1, 2008,

between Getty Images (US), Inc. and "Cobalt Pictures Inc.," by which Cobalt Pictures Inc.

grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive

right to make copyright infringement claims.  Exhibit 4 also contains what appears to be a one-

page print out from the plaintiff's Web site indicating the following:

```
Home
View Contributor
First name              Ken
Last name               Reid
Assigned Office         New York
Contributor Type        House contributor
Pay To Name             Cobalt Pictures Inc.
Business Areas          Creative stills
Segments                unassigned
Region                  Americas
Assigned Home Territory North America
Office  New York
Creative Contact        (none)
Get Agreement form
```

The plaintiff's June 1, 2008 exclusive licensing agreement with Cobalt Pictures Inc. does not

establish that the copyright owner of the image number CA08409, Kenneth Bruce Reid, granted

his exclusive rights in that image to the plaintiff, and the unidentified, unexplained page from

what appears to be the plaintiff's Web site, showing that "Ken Reid" is a "House contributor"

and "Pay To Name Cobalt Pictures Inc.," does not support the plaintiff's claim of exclusive

rights in the image number CA08409.

Image Number 886165-001

Certificate of registration number VA-1-625-855, dated January 3, 2008, shows that "Jeremy Samuelson" is the author and the copyright claimant for the image number 886165-001. The plaintiff's Exhibit 3 shows that the author of the image number 886165-001 is "Samuelson, Jeremy" and the "Contract Company/Brand" is "Getty Images (US), Inc." are "Tony Stone Images/America Inc." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE STONE BRAND AGREEMENT," dated September 1, 2001, between "Tony Stone Images/America" and an artist, "Jeremy Samuelson," by which the artist conveys to Tony Stone Images/America his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a redacted agreement, titled "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated September 1, 2009, between Getty Images (US), Inc. and "jeremy samuelson" by which the contributor conveys to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims. The plaintiff failed to show a valid copyright in the image number 886165-011 because it did not demonstrate what its relationship is with Tony Stone Images/America, Inc.

Image Number 200009356-001

Certificate of registration number VA-1-625-124, dated January 3, 2008, shows that "Oliver Strewe" is the author and the copyright claimant for the image number 200009356-001. The plaintiff's Exhibit 3 shows that the author of the image number 200009356-001 is "Strewe, Oliver" and the "Contract Company/Brand" is "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE PHOTOGRAPHER CHOICE BRAND AGREEMENT," dated

50

October 1, 2002, between "Getty Images (UK) Ltd" and an artist, "Oliver Strewe" by which the artist conveys to Getty Images (UK) Ltd. his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Since the plaintiff did not explain its relationship with Getty Images (UK) Ltd., it did not sustain its burden of establishing it has a valid copyright in the image number 200009356-001.

Image Number 200134384-001

Certificate of registration number VA-1-625-127, dated January 3, 2008, shows that "David John Thompson," with a pseudonym "Tom Morrison," is the author and the copyright claimant for the image number 200134384-001.  The plaintiff's Exhibit 3 shows that the author of the image number 200134384-001 is "Thompson, David (Tom Morrison)" and the "Contract Company/Brand" are "Getty Images (UK), Ltd." and "Getty Images (US), Inc."  Exhibit 4 contains redacted agreements titled: (a) "THE TAXI BRAND AGREEMENT," dated April 1, 2004, between "Getty Images (UK) Ltd" and "Tom Morrison," by which the artist conveys to Getty Images (UK) Ltd his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image"; and (b) "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated July 1, 2008, between "Getty Images (US), Inc." and "David Thompson," by which David Thompson grants exclusive rights to Getty Images (US), Inc. "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  Assuming that "David Thomson," the party to the July 1, 2008 agreement, is the same person as David John Thompson, the person who is the author and copyright claimant for the image 200134384-001, the plaintiff failed to establish a valid copyright in the image number 200134384-001 because it did not demonstrate

what its relationship is with Getty Images (UK) Ltd.

Image Number 889907-001

Certificate of registration number VA-1-625-491, dated January 2, 2008, shows that "David Tsay" is the author and the copyright claimant for the image number 889907-001.  The plaintiff's Exhibit 3 shows that the author of the image number 889907-001 is "Tsay, David" and the "Contract Company/Brand" are "Tony Stone Images/Americas, Inc." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE STONE BRAND AGREEMENT," dated August 1, 2001, between "Tony Stone Images/America" and an artist, "David Tsay," by which the artist conveys to Tony Stone Images/America his exclusive rights to "reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a redacted agreement, titled "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated April 1, 2010, between Getty Images (US), Inc. and "David Tsay" by which the contributor conveys to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  By failing to show its relationship with Tony Stone Images/America, Inc., the plaintiff failed to establish it possesses a valid copyright in the image number 889907-001.

Image Number AB64768

Certificate of registration number VA-1-625-522, dated January 2, 2008, shows that "Elisabeth Valder," with a pseudonym "DiaMAX," is the author and the copyright claimant for the image number AB64768.  The plaintiff's Exhibit 3 shows that the author of the image number "ab64768 is "Valder, Elizabeth (Dia Max; Valder, Lisa)" and the "Contract Company/Brand" are "Getty Images (US), Inc." and "Visual Communications Group Ltd."

Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated November 1, 2001, between "Visual Communications Group Ltd." and an artist, "Lisa Valder," by which the artist conveys to Visual Communications Group Ltd. exclusive right "[t]o reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated January 1, 2010, between Getty Images (US), Inc. and "Elisabeth Valder," by which she grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims. By failing to show that "Lisa Valder," a party to the November 1, 2001 agreement, is the same person as the copyright owner and the party to the January 1, 2010 agreement, "Elisabeth Valder," the plaintiff failed to establish its possession of a valid copyright in the image number AB64768.

Image Number AB32869

Certificate of registration number VA-1-625-854, dated January 3, 2008, shows that "Paul Viant" is the author and the copyright claimant for the image number AB32869.  The plaintiff's Exhibit 3 shows that the author of the image number "ab32869" is "Viant, Paul" and the "Contract Company/Brand" are "Visual Communications Group Ltd." and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT" dated August 1, 2001, between "Visual Communications Group Ltd." and an artist, "Paul Viant" by which the artist conveys to Visual Communications Group Ltd. an exclusive right "[t]o reproduce, distribute, publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated June 1, 2008,

between Getty Images (US), Inc. and "Paul Viant", by which he grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  Since the plaintiff testified that it acquired Visual Communications Group Limited some time around 1999 and that the image number AB32869 is an accepted image for the purpose of the August 1, 2001 agreement, it established that, as of August 1, 2001, it had a valid copyright in that image.

Image Number CA33374

Certificate of registration number VA-1-624-579, dated December 21, 2007, shows that "Anne-Marie Weber" is the author and the copyright claimant for the image number CA33374. The plaintiff's Exhibit 3 shows that the author of the image number "ca33374" is "Weber, Anne Marie" and the "Contract Company/Brand" are "Visual Communications Group Limited" and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated "~~10/1/01~~ 10/1/01," between "FPG International LLC and Visual Communications Group Limited (Collectively the 'Brand Company')" and an entity, "Anne-Marie Weber, Inc. A California Corporation," by which the entity conveys to the Brand Company an exclusive right "[t]o reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image." Exhibit 4 also contains a redacted "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated August 1, 2008, between Getty Images (US), Inc. and "Anne-Marie Weber, Inc.," by which Anne-Marie Weber, Inc. grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims. As the entity Anne-Marie Weber Inc. is not the author and the copyright claimant for the image CA33374, the fact that it is a party to the October 1, 2001 agreement and the August 1, 2008

54

agreement, without more, does not establish that the copyright owner, Anne-Marie Weber, conveyed exclusive rights to the image number CA33374 to the plaintiff.

Image Number CA28987

Certificate of registration number VA-1-625-304, dated January 9, 2008, shows that "Christoph Wilhelm" is the author and the copyright claimant for the image number CA28987. The plaintiff's Exhibit 3 shows that the author of the image number CA28987 is "Wilhelm, Christoph; Picturegarden Ltd." and the "Contract Company/Brand" are "Visual Communications Group Limited" and "Getty Images (US), Inc."  Exhibit 4 contains a redacted agreement, titled "THE VCG BRAND AGREEMENT," dated August 1, 2001, between "FPG International LLC and Visual Communications Group Limited (Collectively the 'Brand Company')" and an artist, "Wilhelm, Christoph," by which he conveys to the Brand Company an exclusive right "[t]o reproduce, distribute publish, transmit, broadcast, display, Exhibit, adapt, crop, modify, recast, enhance, or create derivative works of any Accepted Image."  Exhibit 4 also contains a redacted "GETTY IMAGES CONTRIBUTOR AGREEMENT," dated October 1, 2008, between Getty Images (US), Inc. and "Picturegarden Ltd." by which Picturegarden Ltd. grants to Getty Images (US), Inc. rights "on a Content exclusive basis," including an exclusive right to make copyright infringement claims.  As Picturegarden Ltd. is not the author and copyright claimant for the image CA28987, the fact that it is a party to the October 1, 2008 agreement  is irrelevant to the plaintiff's claim of an exclusive license in the image number CA28987, because the copyright owner of that image is Christophe Wilhelm, not Picturegarden Ltd.  However, the plaintiff's testimony that it acquired Visual Communications Group Limited some time around 1999 and that the image number CA28987 is an accepted image for the purpose of the August 1, 2001 agreement, establishes that, as of August 1, 2001, the plaintiff had a valid copyright in that

55

image.

### *Time of Infringement*

The plaintiff alleges that it "is the exclusive licensee of the images that are the subject of this action."  In order to have standing to assert a copyright infringement claim based on an exclusive license, the plaintiff must show that a valid exclusive license granting an exclusive right to bring copyright infringement claims existed: (a) at the time of the copyright infringement; or (b) after the time of the copyright infringement, but included, explicitly, an exclusive right to bring the claims accrued prior to the date of the agreement.  The plaintiff alleges in its complaint that: (1) it discovered, in September 2006, that the defendant incorporated eight of the plaintiff's images into Web sites it designed, published and managed and used it continuously until "at least September 25, 2006"; (2) the defendant "began using at least four of these images in August 2004 and had been using all eight of the images at least since May 18, 2006"; (3) it discovered, in December 2006, that the defendant incorporated "an additional two images" into the Coquina Hotel, Ltd. Web site; (4) it discovered, in September 2007, "an additional thirty-three images" that the defendant incorporated into seven Web sites; and (5) the defendant "also copied into web sites it designed, publishes, and manages ten other images exclusively licensed to Getty without authorization or license."  According to the allegations, the defendant infringed upon the plaintiff's rights to fifty-three images.  However, the plaintiff alleges that only "[t]hirty-five of the images [the defendant] copied and incorporated into the web sites it designed, publishes, and manages have been registered."  The complaint fails to allege what images, of the thirty-five that have been registered, have been: (a) discovered as infringing in September 2006; (b) used beginning "in August 2004" and had been used "at least since May 18, 2006"; (c) discovered as infringing in December 2006; (d) discovered as

infringing in September 2007; or (e) part of the "ten other images." The plaintiff's Exhibit B, attached to the complaint, consisting of "screen shots of [the plaintiff]'s web sites showing web pages that incorporate unauthorized copies of images exclusively licensed to Getty Images," does not contain any dates. Not only are the allegations respecting the time period of infringement for the thirty-five images at issue in this action not well-pleaded, they are entirely lacking. The complaint and its Exhibits are devoid of any specific allegation or evidence identifying the specific time each of the thirty-five images at issue was infringed. The plaintiff's allegations of the time period during which it discovered the alleged infringement of unidentified images does not aid the Court in determining the time each of the "exclusively licensed" images at issue in this action was infringed. This is so because, the plaintiff has standing to bring a copyright infringement action, with respect to the work covered by the exclusive licenses, only during the time it possesses an exclusive license to assert a copyright claim for those images. The Court's December 16, 2010 order directed the plaintiff to provide evidence establishing: (i) the period during which the infringement was alleged to have occurred; and (ii) exclusive licenses for all images at issue, demonstrating the plaintiff's right to bring this action. That evidence is reviewed below.

The plaintiff's Exhibit 2, the PicScout report for the "Catalog Image No. 1002663l," as it is produced to the plaintiff, demonstrates a date, namely "Upload Date: Sep 06, 2007," which, according to Wojtczak, is "the date that the report is delivered to Getty Images by PicScout." Wojtczak testified that the Picscout report, the plaintiff's Exhibit 2, "has information related to the date of upload and also information related to image size, which is one of the parameters in the license model." When asked: "And the date of the uploading, Exhibit 2 says September 6, 2007; is that right? . . . What does the upload date mean?," he responded: "That is the date the

report is delivered to Getty Images by Picscout."  However, it is not clear from Wojtczak's

testimony whether Exhibit 2's "Upload Date," which is "the date that the report is delivered to

[the plaintiff]," corresponds to the date of the alleged infringement and whether "the date of

upload" means: (a) the date Picscout uploaded the allegedly infringed images from the

infringer's Web sites to its system; (b) the date Picscout uploaded the allegedly infringed images

from its system to the plaintiff's system; or (c) both, the date of Picscout's upload of the images

from the infringing Web sites to its system and the date Picscout delivered its report to the

plaintiff, presumably in an electronic format.  Unlike the plaintiff's Exhibit 2, the plaintiff's

Exhibit B, namely the PicScout reports concerning the thirty-five images at issue, is in the

format in which it is delivered by the plaintiff to the end user, and it does not indicate the dates

when the screen shots were made or any other dates.  By showing no dates at all for any of the

alleged infringements, Exhibit B is not helpful in analyzing the time of infringement.  Moreover,

the plaintiff failed to establish that its Exhibit 2's  "Upload Date," which is the date the PicScout

report is delivered to the plaintiff, is the date of the alleged infringement.

The plaintiff's Exhibit 6 is illustrated partially in Appendix 1.  The plaintiff stated that

the purpose of Exhibit 6 is to support the calculations made in its Exhibit 5, the shopping cart

estimate of the price for each of the thirty-five image's alleged unauthorized use.  Exhibit 6

contains a category styled "Dates of Use for Calculation."  A time period is indicated in that

category column for each of the thirty-five images, based on which the category "License

Duration Required" is determined for each of the thirty-five images.  Wojtczak failed to explain

the category "Dates of Use for Calculation," or how he determined the "start date" and the "end

date" for the purposes of calculating damages either in Exhibit 5 or Exhibit 6.  With respect to

Exhibit 6's category "License Duration Required," he testified: "That is the duration of use that

would have been required based on the - - based on the evidence of duration of use." However, Wojtczak fell short of identifying "the evidence of duration of use" on which he relied or presenting that evidence.

Assuming, without deciding, that Wojtczak used the items enumerated in the category "Evidence of duration of use" to determine the dates in the category "Dates of Use for Calculation," and that, for example, with respect to "Image Number CA33374," in Exhibit 6's category "Evidence of duration of use": (i) "PS Proof 5/18/06" means the PicScout report delivered to the plaintiff on May 18, 2006; and (ii) "WA proof 12/24/05" means the Web archive document dated December 24, 2005, no explanation was provided by Wojtczak of the correlation between the category "Evidence of duration of use" and the category "Dates of Use for Calculation." It is not clear how, based on the PicScout report, delivered on May 18, 2006, and the December 24, 2005 Web archive document, one can conclude that "Dates of Use for Calculation" for "Image Number CA33374" are "Aug 31, 2004-Aug 31, 2006," and Wojtczak never explained this. In fact, the plaintiff's Exhibit 7, Web archive screen shots, contains two documents pertaining to "Image Number CA33374." In those two documents, the "the URL section at the top," which indicates "a date . . . in year format," according to Wojtczak, shows "20060207" and "20051224." Assuming that the information in the field "Evidence of duration of use" in Exhibit 6 derives, to some extent, from the Exhibit 7 Web archive screen shots, and that "WA proof 12/24/05" refers to the Exhibit 7 document, dated December 24, 2005, it appears that "Image Number CA33374" was also documented by the Web archive on February 7, 2006, a fact not listed in Exhibit 6. Nonetheless, the two documents, dated December 24, 2005, and February 7, 2006, in Exhibit 7, submitted in connection with "Image Number CA33374," and the information "PS Proof 5/18/06," in Exhibit 6, do not establish that the infringement period for

that image is "Aug 31, 2004-Aug 31, 2006."  Even assuming that the plaintiff established that the infringement period for the image number CA33374 was "Aug 31, 2004-Aug 31, 2006," the statute of limitations would bar any copyright infringement claim that accrued prior to March 2, 2006, since the complaint was filed on March 2, 2009, and the plaintiff failed to explain why its claims for copyright infringement, accruing prior to March 2, 2006, are not barred by the applicable statute of limitations.  See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2d Cir. 2003) ("Civil actions seeking copyright remedies are barred unless commenced within three years after the claim accrued.  A cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised.") (citations and internal quotation marks omitted).  Moreover, Wojctzak failed to identify and explain what the "Manual non-PS Proof," listed as an item in Exhibit 6's category "Evidence of duration of use" is, for the image numbers "CA28987" and "200270761-001."

Similarly, Wojtczak failed to explain the basis for his determination of the time periods, for all other images at issue, indicated in Exhibit 6's category "Dates of Use for Calculation." Since: (a) the plaintiff failed to allege the specific time of infringement for each of the thirty-five images at issue in this action; (b) no evidence was presented to establish the time period of infringement for each of the thirty-five images; and (c) the record evidence does not support the purported "Dates of Use for Calculation," the Court finds that the plaintiff failed to allege, in its complaint, and to establish, at the hearing, the time period of infringement for each of the thirty-five images.

Although the plaintiff established that it had an exclusive license to the image number: (1) AB16310, as of March 1, 2002; (2) 200009442-001, as of October 1, 2002; (3) BA62505, as of August 1, 2001; (4) CA16423, as of January 1, 2001; (5) BA60210, as of October 1, 2001;

(6) AB32869, as of August 1, 2001; and (7) CA28987, as of August 1, 2001, and it alleged that these images had been infringed by the defendant, absent a well-pleaded allegation or evidence of the specific time period of infringement, for each image at issue in this action, the plaintiff cannot establish that the defendant is liable to it or that it is entitled to relief in connection with the images licensed exclusively to it.  Similarly, without establishing that image number 20270761-001 was infringed at any particular time, the plaintiff cannot demonstrate that the defendant is liable to it or that it is entitled to relief in connection with the alleged infringement.

### *Whether the Default Was Willful*

The Court's May 19, 2010 order, granting defense counsel's application to be relieved of the obligation of continuing to represent the defendant and instructing the defendant to engage new counsel by June 1, 2010, was served on the defendant on May 21, 2010. The defendant failed to appear for the June 7, 2010 conference.  The Court's November 2, 2010 memorandum and order denying the plaintiff's motion for judgment, by default, as well as the Court's November 2, 2010 order directing, inter alia, the Clerk to enter the defendant's default, were served on the defendant.  On November 2, 2010, the Clerk of Court entered the defendant's default.  The plaintiff's December 9, 2010 motion for judgment, by default, was served on the defendant.  Despite being aware, at least since May 21, 2010, that it may not proceed without engaging new counsel and that it was provided, by the November 2, 2010 order, an opportunity to make a motion to set aside its default, the defendant failed to appear by counsel.  The defendant did not oppose the instant motion.  Therefore, the Court concludes that the defendant's default was willful.

### *The Extent of Any Prejudice to the Plaintiff*

To the extent that the plaintiff can establish the elements of its copyright infringement

claim, the defendant's failure to engage counsel and defend against this action would be prejudicial to the plaintiff because it impeded the plaintiff's prosecution of the action and caused the resolution of the action to be delayed substantially.  However, the plaintiff has failed to establish its copyright infringement claim by failing to demonstrate that: (1) it has a valid copyright in some of the images, as discussed above; and (2) the defendant is liable to it in connection with the images for which the plaintiff did establish it possesses a valid copyright.

*Whether Material Issues of Fact or Issues of Substantial Public Importance Are at Issue*

In light of the foregoing analysis of the plaintiff's claim that the images at issue are licensed exclusively to it, the Court finds that material issues of fact exist with respect to the plaintiff's copyright ownership interest in twenty-seven of the images at issue, as discussed above.  Moreover, with respect to the remaining eight images at issue, no specific time of infringement was asserted or established by the plaintiff.  Additionally, whether the plaintiff, who is alleged to be "one of the world's leading content providers," licensing "imagery via the Internet" and serving "an average of 3.2 million thumbnails, 6.5 million visits and 3.5 million unique users in addition to an average of 167 million page views each month," has an exclusive right(s) in any particular image has the potential to be an issue of substantial public importance, given the size and scope of the plaintiff's alleged image collections.

*Whether a Meritorious Defense Is Presented*

The defendant's affirmative defense that "[s]ome of the plaintiff's claims are barred by the applicable statute of limitations" is potentially meritorious, because the plaintiff failed to allege or show the specific time of infringement and its claims are limited to those that accrued within the three years prior to March 2, 2009, the date this action commenced.  See Estate of Burne Hogarth, 342 F.3d at 163.

62

*The Amount of Money at Stake*

The plaintiff seeks $24,275.00, with interest, for the alleged infringement of the thirty-five images.  The amount sought is not insubstantial.

*Whether the Default Was Caused by an Excusable Neglect*

As discussed above, the defendant failed to engage counsel and provided no excuse for that failure.  Therefore, the default was caused by an inexcusable neglect on the part of the defendant.

Based on the foregoing, the Court finds that the plaintiff failed to sustain its burden of establishing its copyright infringement claim in connection with the images at issue and the finding of liability is not warranted.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for judgment, by default, pursuant to Fed. R. Civ. P. 55(b)(2), Docket Entry No. 39, is denied, and the action is dismissed with prejudice.

Dated: New York, New York
      June 29, 2011

SO ORDERED:

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

63

Appendix 1
Partial Illustration of the Plaintiff's Exhibit 6

| | Name | Image Number | Date of Registration | Registration Number | Image Size | Image Placement | Date of Use for Calculation | License Duration Required | Evidence of duration of use |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Back of women in pool | CA33374 | ##### | VA-1-624-579 | Up to ½ page | Repeated | Aug 31, 2004-Aug 31, 2006 | Up to 2 years | PS Proof 5/18/06, WA proof 12/24/05, *secondary page and low resolution |
| 2 | "For Sale" sign outside house, close-up | BA60210 | ##### | VA-1-625-002 | Medium Res | Secondary Page | Aug 31, 2004-Aug 31, 2007 | Up to 3 years | PS proof 9/06/07, WA is blocked (robots), *low resolution calculation |
| 3 | Woman lying on raft in swimming pool, overhead view | AB22261 | 1/3/2008 | VA-1-625-008 | Up to ½ page | Repeated | May 18, 2006-June 18, 2006 | Up to 1 month | PS Proof 5/18/06, Nothing in WA prior to 5/26/06, *secondary page and |
| 4 | Calendar pages, close-up (grainy) | BA17693 | 1/2/2008 | VA-1-625-100 | Medium Res | Secondary Page | Aug 31, 2004-Aug 31, 2007 | Up to 3 years | PS Proof 9/06/07, WA proof 02/05/05,* *low resolution calculation |
| 5 | Businesswoman catching falling money | 200167546-004 | 1/3/2008 | VA-1-625-102 | Low Res | Secondary Page | Aug 31, 2004-Aug 31, 2007 | Up to 3 years | PS Proof 9/06/07, Nothing in WA (missing image "x" only) |
| 29 | Desk in office, close-up | 200270761-001 | 1/9/2008 | VA-1-626-053 | RF-502KB file (approx 160 x 600 pixles) | Secondary Page | RF- 1 day | 502KB file purchase (perpetual)- medium size | Manual non-PS Proof 12/01/06, Nothing in WA |